**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS – DALLAS DIVISION**

| | | |
|---|---|---|
| **ANDY SOTO** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No._____** |
| | § | |
| **PAULINE CORONADO-NEWTON,** | § | |
| **BIJU ABRAHAM,** | § | |
| **RAHIM MAWANI,** | § | |
| **DAULAT R. "NEIL" AGGARWAAL,** | § | |
| **COAB CONTRACTORS LLC,** | § | |
| **C & A ASSOCIATES INC,** | § | |
| **DSA PARTNERS II, LTD.,** | § | |
| **DSA ENTERPRISES, L.L.C.,** | § | |
| **A & R TEXAS PROPERTIES LLC,** | § | |
| **TEXAS A & R ENTERPRISES LLC.** | § | |
| **Defendants.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

NOW COMES Plaintiff Andy Soto seeking relief from Defendants, Pauline Coronado-Newton, Biju Abraham, Rahim Mawani, Daulat R. "Neil" Aggarwaal, COAB Contractors LLC, C & A Associates Inc, DSA Partners II, Ltd., A & R Texas Properties LLC, A & R Texas Enterprises LLC., and DSA Enterprises, LLC, as described herein.

SUMMARIZING – Defendants in this case took advantage of Plaintiffs lack of expertise and conspired to defraud him of more than $20,000 through the fraudulent extension of property and credit. Defendants are now known scam artists and are the subject of more than fifty complaints in Dallas County stemming from their repeated pattern of racketeering activity. Plaintiff requests this Court award him the damages he suffered from the multitude of offenses that Defendants inflicted upon him and any other relief to which he may be entitled in law and in equity.

# I.     TABLE OF CONTENTS

I.     TABLE OF CONTENTS ................................................................................ 2
II.    TABLE OF AUTHORITIES ......................................................................... 3
III.   PARTIES AND SERVICE ............................................................................ 5
IV.    JURISDICTION AND VENUE .................................................................... 6
V.     FACTS .......................................................................................................... 6
       A.   Andy Soto Enters an Agreement with Pauline Coronado-Newton ............... 6
       B.   Defendants' Racketeering Enterprise Revealed ............................................ 8
       C.   Defendants are now known for a pattern of fraud. ..................................... 11
VI.    CAUSE OF ACTION – STATUTORY FRAUD ......................................... 13
       A.   Legal Standard. .......................................................................................... 13
       B.   Application. ................................................................................................. 13
VII.   CAUSE OF ACTION – COMMON LAW FRAUD ..................................... 14
       A.   Legal Standard. .......................................................................................... 14
       B.   Application. ................................................................................................. 14
VIII.  CAUSE OF ACTION - TEXAS DTPA ....................................................... 15
       A.   Legal Standard. .......................................................................................... 15
       B.   Application. ................................................................................................. 15
IX.    CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY ....................... 16
       A.   Legal Standard. .......................................................................................... 16
       B.   Application. ................................................................................................. 17
X.     CAUSE OF ACTION – AIDING & ABETTING BREACH OF FIDUCIARY DUTY .. 17
       A.   Legal Standard. .......................................................................................... 17
       B.   Application. ................................................................................................. 18
XI.    CAUSE OF ACTION – VIOLATION OF THE REAL ESTATE LICENSE ACT ......... 18
       A.   Legal Standard. .......................................................................................... 18
       B.   Application. ................................................................................................. 18
XII.   CAUSE OF ACTION – CIVIL VIOLATION OF FEDERAL RICO ............ 18
       A.   COUNT I - Coronado .................................................................................. 19
       B.   COUNT II – Fraudulent Rent Collectors .................................................... 20
       C.   COUNT III - Fraudulent Financier Defendants .......................................... 21
       D.   COUNT IV - Fraudulent Property Managers .............................................. 22
XIII.  ECONOMIC AND ACTUAL DAMAGES ................................................. 24
XIV.   DAMAGES FOR MENTAL ANGUISH ..................................................... 24
XV.    MULTIPLE DAMAGES .............................................................................. 24
XVI.   ATTORNEY'S FEES .................................................................................. 25
XVII.  CONDITIONS PRECEDENT ..................................................................... 25
XVIII. PRAYER ..................................................................................................... 26

## II.    TABLE OF AUTHORITIES

**Cases**

*Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)................................... 16

*Cox Tex. Newspapers, L.P. v. Wootten*,

      59 S.W.3d 717, 722 (Tex. App.--Austin 2001, pet. denied)............................. 18

*Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet. denied) ........................ 14

*Hruska v. First Bank of Deanville*,

      727 S.W.2d 732, 736 (Tex. App.—Houston [1st Dist.] 1987) ........................ 17

*In re First Merit Bank*, N.A., 52 S.W.3d 749, 758 (Tex. 2001) .................................... 15

*Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.— Dallas 2006, pet. denied)........................... 17

*Kastner v. Jenkens & Gilchrist, P.C.*,

      231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.)................................18

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,

      138 Tex. 565, 160 S.W.2d 509, 513-14 (Tex. 1942) ...................................... 18

*Lundy v. Masson*,

      260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. Denied) ................. 17

*PAS, Inc. v. Engel*,

      350 S.W.3d 602, 612-613 (Tex. App.—Houston [14th Dist.] 2011, no pet.).................. 17

*Price v. Pinnacle Brands*, 138 F.3d 602, 606 (5th Cir. 1998) ...................................... 20

*Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006)..................................... 17

**Statutes**

18 U.S.C. § 1961(5) ....................................................................... 20, 21, 22, 23

18 U.S.C. § 1962........................................................................... 26

18 U.S.C. § 1962(c) ............................................................................... 20, 21, 22, 23

18 U.S.C. § 1964 ................................................................................................ 6

18 U.S.C. § 1965 ................................................................................................ 6

18 U.S.C.A § 1962(c) ........................................................................................ 18

18 USCS § 893 ................................................................................... 20, 22, 23

28 U.S.C. § 1391 ............................................................................................... 6

Tex. Bus. & Com. Code § 17.45(5) .................................................................. 15

Tex. Bus. & Com. Code § 17.45(9) .................................................................. 24

Tex. Bus. & Com. Code §17.50(a), et seq ....................................................... 15

Tex. Bus. and Com. Code § 17.50(b)(1) .....................................................25, 26

Tex. Civ. Prac. & Rem. Code Chapters 37 & 38 et seq .................................. 25

Tex. Occ. Code § 1101.754 .............................................................................. 18

### III.   PARTIES AND SERVICE

1.      Plaintiff **Andy Soto** resides in Texas and may be contacted through his attorneys of record, the undersigned.

2.      Defendant **Pauline Coronado-Newton** resides in Texas and may be served at 2805 N. Britain Road, Irving, TX 75062-8936, or wherever she may be found.

3.      Defendant **Biju Abraham** resides in Texas and may be served at 1904 Cottonwood Valley Circle South, Irving, Texas 75038, or wherever he may be found.

4.      Defendant **Rahim Mawani** resides in Texas, and may be served at 4001 N. Josey Lane, Suite 100, Carrollton, TX 75007, or wherever he may be found.

5.      Defendant **Daulat R. "Neil" Aggarwaal** resides in Texas, and may be served at 2205 Misty Haven Ln., Plano, TX 75093-2558, or wherever he may be found.

6.      Defendant **COAB Contractors LLC** is a Texas Limited Liability Company, which may be served through its registered agent C & A Associates Inc. at its registered address of 2121 W. Airport Freeway, Ste. 101, Irving, TX 75062, or through the Texas Secretary of State.

7.      Defendant **C & A Associates Inc** is a Texas corporation, which may be served through its registered agent, Dionne Cheshier, at 2121 W. Airport Freeway, Ste. 101, Irving, TX 75062, or through the Texas Secretary of State.

8.      Defendant **DSA Partners II, Ltd.** is a Texas Limited Partnership which may be served through its registered agent Daulat R. Aggarwaal at its registered address of 2205 Misty Haven Ln. Plano, TX 75093-2558, or through the Texas Secretary of State.

9.      Defendant **DSA Partners, L.L.C.**, is a Texas Limited Partnership which may be served through its registered agent Daulat R. Aggarwaal at its registered address of 2205 Misty Haven Ln. Plano, TX 75093-2558, or through the Texas Secretary of State.

10.     Defendant **A & R Texas Properties LLC** is a Texas Limited Liability Company, which may be served through its registered agent Rahim Mawani at its registered address of 4001 N. Josey Lane Suite 100, Carrollton, TX 75007, or through the Texas Secretary of State.

11.     Defendant **Texas A & R Enterprises LLC** is a Texas Limited Liability Company, which may be served through its registered agent David Romeo Alaniz at its registered address of 705 Cancun Apt. 1, Pharr, TX 78577-2420 or through the Texas Secretary of State.

## IV.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

13.     Venue is proper in this judicial district under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this district and reside in this district.

14.     The subject matter of this case is within the jurisdiction of this court.

15.     Damages sought are within the jurisdictional limits of this court.

16.     Plaintiff seeks monetary relief of $100,000 or less.

17.     Venue in the Northern District of Texas, Dallas Division is appropriate as Dallas County is the county in which a substantial part of the events or omissions giving rise to the claim occurred and is the county where the real Property that is the subject of this suit is located.

## V.     FACTS

**A. Andy Soto Enters an Agreement with Pauline Coronado-Newton**

18.     On November 12, 2020, Andy Soto sought to find a home to purchase and contacted Pauline Coronado-Newton ("Coronado") on the recommendation of a friend, who was Coronado's nephew. Exhibit 1.

19.     Soto and Coronado communicated on the phone, where Soto told Coronado that he was currently renting a home in Fort Worth. Coronado advised Soto that he would always be "in the hole" financially while renting, and that purchasing a home would be a wiser decision. Coronado

explained that if he owned a home, he could later sell it if he were to get into financial trouble. Exhibit 1.

20.     Coronado told Soto that she knew of a house that she could place him in. This house is located at 1610 Acosta St, Grand Prairie, Texas 75051 (the "Property"). See Exhibit 1.

21.     Biju Abraham, David Romeo Alaniz, and Rahim Mawani of A & R Texas Properties LLC, which owns the Property, previously gave Coronado permission to show the Property. Exhibit 1 and 2.

22.     Upon hearing that Soto had $20,000 in savings, Coronado told him that she and her associates could execute a rent-to-own agreement for the Property where Soto would put $20,000 down and pay $1,400 monthly. Exhibit 1 and 3.

23.     Relying on Coronado's representation that he would eventually own the Property, Soto made his first payment to Coronado for $500 on November 19, 2020. This payment was memorialized in a receipt written by Pauline. Soto continued to pay Pauline more than $20,000 through various means, including the online payment portal Zelle. Exhibit 1 and 3.

24.     The Property needed substantial repairs, so Pauline agreed to credit the cost of repairs Soto performed toward the total price of the Property. Soto spent more than $4,000 on repairs and improvements to the Property, which included replacing cabinets, remodeling the kitchen, and deep cleaning the Property, as it was infested with cockroaches and rats. Exhibit 1.

25.     Coronado then suggested that she and Soto go into business together, knowing that he had previously expressed interest in real estate investment. Coronado explained that the two of them would invest in houses together and flip them for profit. Coronado stated that her associate Daulat R. Aggarwaal ("Aggarwaal") of DSA Partners II, Ltd., whom she introduced as "Neil",

would finance the transactions and owned other homes that would be prime candidates for "flipping." Exhibit 1 and 4.

## B. Defendants' Racketeering Enterprise Revealed

26.    On February 28, 2021, two individuals appeared on the Property and introduced themselves to Soto as "Abraham" and "David". Soto later learned their full names were Biju Abraham and David Romeo Alaniz. Upon information and belief, Abraham and David are both owners of A & R Texas Properties LLC, though they did not share this information with Soto at the time. Exhibit 1 and 11.

27.    Abraham and David represented that they were the owners of the Property and that Coronado had not given them any of the money Soto paid her. Abraham and David told Soto that he had no ownership interest in the Property and that Coronado had no authority to execute a rent-to-own agreement with him. See Exhibit 1 and 4.

28.    When Soto asked them how he could get the money back from Coronado, they told him the money was gone, and he would need to pay them rent if he wished to stay on the Property. Exhibit 1.

29.    Soto objected, explaining to them that he had already paid Coronado more than $20,000, which was supposed to constitute rent payments and a down payment on the Property, but they again claimed that they never received any of that money. Exhibit 1 and 3.

30.    Abraham and David had a history of working with Pauline and allowed her to show and fill other properties owned by their company, Texas A & R Properties LLC, including a Property at 3601 McCarthy Street, Irving, TX 75062, which Abraham showed to Soto as an alternative to the Property. Abraham and David explained that Coronado had a history of defrauding people. Despite their knowledge of Coronado's deceptive practices, David and

Abraham continued to work with Coronado, allowing her to use their properties as a vehicle to perpetuate fraud.[1] Exhibit 1.

31.     Coronado paid David and Abraham to allow her to show the Property through Zelle from an account labeled COAB Contractors LLC, which upon information and belief, is a company co-owned by Abraham and Coronado. See Exhibit 1 and 3.

32.     Soto told Abraham and David that he would be willing to start paying rent when certain repairs were made to the Property, including plumbing repairs, window repairs and updates, shower repairs, and general maintenance. David and Abraham agreed to the proposal, but never completed the repairs as promised. See Exhibit 1.

33.     Based on what David and Abraham had told him, Soto confronted Coronado about refunding the money he gave had given her. Coronado insisted that Abraham and David were lying and further claimed that the more than $20,000 Soto had given her was gone. She stated that she could not afford to repay Soto and offered to put in him in a different property at 2901 Caladium Court, Garland, TX 75040. She again suggested flipping properties, which she assured Soto would be a good way to recover his money. Exhibit 1, 3 and 4.

34.     Unsure of whom to believe, Soto determined it would be best to move his family, given the atrocious state of the Property. Since Coronado had suggested Aggarwaal as a third party for purchasing a home, Soto contacted Aggarwaal to set up financing for an alternative home. However, Aggarwaal refused to work with him until Soto paid Coronado a $5,000 "finder's fee" for bringing Aggarwaal the business. Aggarwaal insisted that the payment be made up-front before he would finance any real estate transactions. Soto paid Coronado the additional $5,000.

---

[1] Coronado's behavior is now well known to the DFW metroplex due in part to her lengthy history of deceptive practices and now extensive media coverage. See an example of the coverage here: https://www.wfaa.com/article/news/local/investigates/stuck-in-the-middle-investigation-reveals-alleged-home-scam-targeting-latinos/287-605256329

Financing with Aggarwaal subsequently fell through, and Coronado refused to refund the $5,000 that Aggarwaal had required Soto to pay her. See Exhibit 1.

35.     On March 23, 2021, David and Abraham returned to the Property to discuss a formal rental agreement and the repairs that still needed to be completed before Soto would begin paying them rent. David and Abraham stated that they would present Soto with a formal lease agreement to sign. See Exhibit 1.

36.     Though a formal agreement was never presented to Soto, Abraham and David continued to press him to pay them rent through text messages, even though they still had failed to complete the repairs. Soto responded by asking for the written agreement. See Exhibit 1 and 5.

37.     Soto spoke to Abraham in a phone call and explained that he had retained the undersigned, who could review the lease agreement, and requested that Abraham send it over. Abraham agreed to do so, then ceased all communication with Soto. See Exhibit 1 and 7.

38.     Soto discovered that the Property's water and electricity had been shut off. After unsuccessfully attempting to call Abraham several times, Soto restored service under his own name. See Exhibit 1.

39.     Soto then received a call from a woman who introduced herself as "Maria", who claimed to handle the legal problems of the Property's owner. Maria attempted to intimidate Soto, telling him that he was squatting on the Property and would be sent a notice to vacate. Exhibit 1 and 8.

40.     Soto objected, explaining that Abraham and David were going to provide him with a formal lease agreement. Maria responded by asserting that Abraham had no right to the Property, and therefore could not have conveyed the Property to Soto. She also stated that Coronado had no right to the Property and had caused problems for people like Soto in this manner before. Exhibit 1 and 8.

41.     Maria refused to give Soto the name of her employer or answer the question of whether she was an attorney, and ended the phone call by claiming she could not speak with Soto if he were represented by an attorney, emphasizing her attempt to imitate an attorney herself. See Exhibit 1 and 8.

42.     Maria subsequently admitted to the undersigned that she works as an agent of Texas A & R Enterprises, LLC, managing their legal affairs and handling evictions. Exhibit 9.

43.     After vacating Property to secure his family, Soto eventually returned to the Property to collect his kitchen appliances, specifically his refrigerator and stove. When Soto arrived, Soto noticed that Pauline, Abraham, or one of the other Defendants involved in this conspiracy had moved a new family into the property. Soto was unable to retrieve his appliances. Soto's appliances are now wrongfully possessed by one of the Defendants or were inappropriately disposed of. See Exhibit 1.

44.     Last, in preparation for this suit, the undersigned sent a demand letter to A & R Properties LLC's registered agent Rahim Mawani. Mawani called the undersigned's office in response to the letter and explained that he was an owner of Texas A & R Properties LLC. Mawani claimed that before he received the letter, he had no idea that the Property was occupied by Soto. Upon being questioned about the call Soto received from Maria, who claimed to work for Mawani, Mawani alleged that he did not have anyone named Maria working for him. Exhibit 10.

45.     Mawani claimed that he had a purchase-sale contract for the Property signed by Abraham. Exhibit 10.

**C.  Defendants are now known for a pattern of fraud.**

46.     Unfortunately, Soto has not been the only victim of Defendants' fraudulent schemes. Over the past several years, Defendants have gained media attention for scamming unsuspecting first-time would-be homeowners out of their money. See Exhibit 12.

47.   From the facts and evidence available, it appears the scheme is practiced as follows:

a.  Coronado approaches or is approached by an unsophisticated party, desiring to purchase a first-time home.

b.  Coronado acts as a proto-real estate agent for the interested party and offers them a rent-to-own agreement or some other seemingly lucrative offer to own a home.

c.  Each home is owned by one or more of her associates and are often in an advanced state of disrepair.

d.  The party signs the agreement and pays a substantial down payment on the property, usually amounting to more than $10,000.

e.  Coronado distributes this payment between her associates and herself.

f.  Coronado's associates approach the party and state that Coronado has no legal right to the property; hence the party must pay rent to Coronado's associates or immediately vacate.

g.  At this point, the party will either comply with the demand for rent, vacate the premises, or catch on that something seems fraudulent and ignore Coronado's associates.

h.  If the party complies with the demands for rent, another of Coronado's associates will approach the party and represent that neither Coronado, nor any of her other associates has a legal right to the property. If the party ignored the demands for rent from Coronado's associates, the plot is much the same. The associate will threaten the party with eviction if he does not immediately vacate. Coronado's associates will then use further scare tactics, such as cutting off utilities, to force the party off the property.

i.  Once the party has been forced off the property, Coronado and her associates start the cycle over, bringing in new would-be homeowners and scamming them out of their money.

48.     Normally, such as scheme would not last for as long as Coronado's has, but she intentionally targets unsophisticated potential home buyers who are ignorant of real-estate law. Because the scammed parties do not initially know they had been scammed, Coronado and her associates are able to repeatedly execute their scheme. So far, more than fifty families have now filed complaints with the Dallas County District Attorney's Office based on this fraud. Exhibit 12.

## VI.     CAUSE OF ACTION – STATUTORY FRAUD

### A.  Legal Standard.

49.     A Plaintiff establishes a statutory fraudulent inducement claim under section 27.01 of the Business and Commerce Code by showing: a false representation of a material fact; made to induce a person to enter a contract; and relied on by that person in entering the contract. *Fletcher v. Edwards*, 26 S.W.3d 66, 77 (Tex. App.—Waco 2000, pet. denied).

50.     The statutory cause of action differs from the common law only in that to recover actual damages, it does not require proof that the Defendant made a materially false representation knowing it to be false or made it recklessly as a positive assertion without any knowledge of its truth. *Fletcher*, 26 S.W.3d at 77.

### B.  Application.

51.     There was a transaction involving real estate.

52.     During the transaction, Defendants made multiple false representations of fact, including but not limited to the following: (1) Defendants asserted that the contract Soto signed was a "rent-to-own" agreement instead of a simple rental agreement; (2) Defendants asserted that the $20,000 Soto paid was a down payment on the Property; (3) Defendants asserted that Soto needed to pay a $5,000 finder's fee before closing on an investment Property.

53.     The false statements and promises were made to induce Soto to enter a prejudicial, detrimental, and disadvantageous real estate contract with Defendants.

54.     Soto relied on the false representation to enter the contract, and the reliance caused Soto to lose more than $20,000 as described prior.

## VII.     CAUSE OF ACTION – COMMON LAW FRAUD

**A.  Legal Standard.**

55.     To bring a claim for common law fraud, a Plaintiff must show the following: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re First Merit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2001) (orig. proceeding).

**B.  Application.**

56.     Defendants made material, false representations to Soto with the knowledge of their falsity or with reckless disregard for the truth, including but not limited to (1) Defendants asserted that the contract Soto signed was a "rent-to-own" agreement instead of a simple rental agreement; (2) Defendants asserted that the $20,000 Soto paid was a down payment on the Property; and (3) Defendants asserted that Soto needed to pay a $5,000 finder's fee before closing on an investment Property. Soto relied on these representations to his detriment, having been backed into a financial corner where he was unlikely to be able to perform.

57.     Defendants concealed or failed to disclose material facts within their knowledge, including the nature of the contract and the ownership status of the Property. Defendants knew that Soto did not have knowledge of same and Defendants dissuaded Soto from investigating

other options further by the fiduciary relationship that Defendants inculcated between them and Soto. Defendants intended to induce Soto to enter the transaction that made the basis of this suit by such concealment or failure to disclose.

58.     As a proximate result of such fraud, Soto sustained the damages described herein.

## VIII.   CAUSE OF ACTION - TEXAS DTPA

### A.  Legal Standard.

59.     To prevail on a Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA") claim, the Plaintiff must demonstrate (1) the Plaintiff's status as a consumer; (2) the Defendant can be sued under the DTPA; (3) the Defendant committed a wrongful act under the DTPA; and (4) the Defendant's actions were a producing cause of the Plaintiff's damages. Tex. Bus. & Com. Code §17.50(a), et seq; *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) ("A consumer must, in order to prevail on a DTPA claim, . . . establish that each Defendant violated a specific provision of the Act, and that the violation was a producing cause of the claimant's injury.").

### B.  Application.

60.     Defendants engaged in false, misleading, and deceptive acts, practices, and omissions actionable under the DTPA when they induced Soto to sign a rental agreement while deceiving him into believing he was signing a "rent-to-own" agreement.

61.     Defendants engaged in an unconscionable course of action as defined by Tex. Bus. & Com. Code § 17.45(5), to the detriment of Soto by taking advantage of Soto's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. Defendants represented themselves as real estate experts and in several instances as real estate agents. Soto, contrastingly, was a first-time homebuyer without the industry experience possessed by Defendants, and for that reason was at a substantial disadvantage.

62.     Soto, a consumer, would further show that the acts, practices, and omissions complained of herein, produced Soto's damages including but not limited to $20,000 of payments made to Coronado and other Defendants under their false representation that he had signed a "rent-to-own" agreement.

63.     Soto would further show that the acts, practices, and omissions complained of herein were relied upon by Soto, to Soto's detriment. Defendants made multiple false representations of fact, including but not limited to the following: (1) Defendants asserted that the contract Soto signed was a "rent-to-own" agreement instead of a simple rental agreement; (2) Defendants asserted that the $20,000 Soto paid was a down payment on the Property; (3) Defendants asserted that Soto needed to pay a $5,000 finder's fee before closing on an investment Property. Each of these statements substantially harmed Soto as he relied on their veracity to make financial decisions.

## IX.     CAUSE OF ACTION – BREACH OF FIDUCIARY DUTY

**A.  Legal Standard.**

64.     The elements of a breach-of-fiduciary-duty claim are: (1) a fiduciary relationship existed between a plaintiff and defendant; (2) the defendant breached its fiduciary duty to the plaintiff; and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. Denied); *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.— Dallas 2006, pet. denied). A Plaintiff does not need to prove that it reasonably or justifiably relied on the Defendant's conduct. *PAS, Inc. v. Engel*, 350 S.W.3d 602, 612-613 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

65.     A fiduciary relationship may arise informally from a moral, social, or personal relationship and includes those informal relationships that exist when one party trusts and relies

on the other. *Hruska v. First Bank of Deanville*, 727 S.W.2d 732, 736 (Tex. App.—Houston [1st Dist.] 1987), rev'd on other grounds, 747 S.W.2d 783 (Tex. 1988).

66.    In a situation where the Plaintiff's breach of fiduciary duty claim is based on non-negligent conduct, such as fraud or malice, a Plaintiff can "recover economic damages, mental anguish, and exemplary damages." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

**B.  Application.**

67.    Pauline Coronado owed a formal, or at least an informal fiduciary duty to Andy Soto.

68.    The actions and conduct of Coronado as a fiduciary—including but not limited to inducing Soto to place himself in a financially detrimental position to Pauline's benefit—constitute a breach of fiduciary duty.

69.    Said breach of fiduciary duty caused Soto injury resulting in damages.

70.    Soto asks for all penalties at law resulting from breach of fiduciary duty by Coronado.

**X.      CAUSE OF ACTION – AIDING & ABETTING BREACH OF FIDUCIARY DUTY**

**A.  Legal Standard.**

71.    When a Defendant knowingly participates in the breach of a fiduciary duty, he becomes a joint tortfeasor and is liable as such. *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.—Dallas 2007, no pet.); *see also Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 513-14 (Tex. 1942).

72.    A cause of action based on a contribution to a breach of fiduciary duty must involve the Defendant's knowing participation in such a breach. *Kastner*, 231 S.W.3d at 580; *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex. App.--Austin 2001, pet. denied).

**B. Application.**

73.    By acting as potential financier of the future real estate investments with knowledge of Coronado's breach of her fiduciary duty to Soto, Aggarwaal knowingly participated in the breach.

74.    By aiding Coronado in her conspiracy to place individuals in homes under the impression they were "renting to buy" then later having them evicted for "failure to pay rent" on a regular rental agreement, David Romeo Alaniz knowingly participated in the breach.

## XI.    CAUSE OF ACTION – VIOLATION OF THE REAL ESTATE LICENSE ACT

**A. Legal Standard.**

75.    The Texas Real Estate License Act (TRELA) itself only provides one private cause of action, which is for a claim against an unlicensed person who collected a commission for brokerage services. This private cause of action provides that the unlicensed broker or salesperson is liable to the aggrieved person for a penalty of not less than the commission amount, and up to three times that amount. Tex. Occ. Code § 1101.754.

**B. Application.**

76.    Coronado held herself out to be a licensed real estate agent, while fully aware that she was not. She collected a commission in the amount of $5,000 from Plaintiff. Therefore, Plaintiff prays this court grant him a judgment under Tex. Occ. Code § 1101.754 for the commission amount of $5,000 and an additional $15,000 as treble damages totaling $20,000.

## XII.    CAUSE OF ACTION – CIVIL VIOLATION OF FEDERAL RICO

77.    18 U.S.C.A § 1962(c) "prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering…" where "racketeering" activity is defined to include a variety of state and federal predicate crimes and "pattern of racketeering activity" requires at least two acts of racketeering activity. 18 U.S.C.A § 1961(1).

78. Federal RICO includes a civil remedy provision that permits private parties to sue for damages to their business or property caused "by reason of" a violation of RICO. *Id.* at 1964(c).

79.     RICO requires "a person" who violated or conspired to violate § 1962(a), (b), or (c). Section 1961(3) defines a culpable "person" as an "entity capable of holding a legal or beneficial interest in property."

80.     To state a civil RICO claim under § 1962, a plaintiff must allege: (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. As a preliminary matter, however, a plaintiff must establish that he has standing to sue. "The standing provision of civil RICO provides that 'any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor . . . and shall recover threefold the damages he sustains.'" Thus, a RICO plaintiff must satisfy two elements   injury and causation. *Price v. Pinnacle Brands*, 138 F.3d 602, 606 (5th Cir. 1998).

### A.  COUNT I - Coronado

81.     This Count is against Defendant Pauline Coronado-Newton ("Coronado").

82.     Since Coronado and the other Defendants in the instant case have obscured their corporate structure through shell companies and beneficial ownership, no one company will suffice to describe the enterprise. Therefore, the enterprise ought to be considered an association-in-fact enterprise headed by Pauline Coronado-Newton. To reference this arrangement, Plaintiff names it the "Coronado Cabal".

83.     Coronado  agreed  to  and  did  conduct  and  participate  in  the  conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

   a.  Coronado represented herself as a real estate agent to Plaintiff,

   b.  Coronado represented she had the legal right to transfer the Property to Soto.

c. Coronado represented the contract Soto signed as a rent-to-own agreement.

d. Coronado took $20,000 from Soto as a "down payment" on the Property though she was fully aware she had no right to transfer the property and she had not presented Soto with a rent-to-own agreement.

e. Coronado took $5,000 from Soto as a commission fee while acting as a real estate agent, even though she was not licensed as such.

84.    Pursuant to and in furtherance of their fraudulent scheme, Defendant committed multiple related acts of financing extortionate extensions of credit as described in 18 USCS § 893.

85.    The above-described acts by Coronado comprise a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

86.    Coronado has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

87.    As a direct and proximate result of the Coronado's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his property in that he lost: $20,000 on the down payment stolen by Coronado; $4,000 in uncompensated repairs to the Property; and $5,000 on a fraudulent commission to Coronado.

88.    Based on the above, Plaintiff requests that this Court enter judgment against Coronado as follows: actual damages amounting to $29,000, treble damages amounting to $87,000, and attorney's fees in excess of $10,000.

**B. COUNT II – Fraudulent Rent Collectors**

89.    This Count is against Defendants Biju Abraham, David Alaniz, COAB CONTRACTORS LLC, C & A ASSOCIATES INC., A & R TEXAS PROPERTIES LLC, and TEXAS A & R ENTERPRISES LLC ("Fraudulent Rent Collectors").

90.     The association-in-fact enterprise, herein named the Coronado Cabal is an enterprise engaged in and whose activities affect interstate commerce.

91.     The Fraudulent Rent Collectors agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically:

   a.   Fraudulent Rent Collectors sought to obtain rent fraudulently from Soto, though no rental agreement between Fraudulent Rent Collectors and Soto existed.

   b.   Fraudulent Rent Collectors attempted to intimidate and harass Soto into paying rent, though no rental agreement was in place.

92.     The above-described acts by the Fraudulent Rent Collectors comprise a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

93.     The Fraudulent Rent Collectors have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

94.     As a direct and proximate result of the Fraudulent Rent Collectors' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his property in that he lost $20,000 on the down payment stolen by Coronado for the enterprise and $4,000 in uncompensated repairs to the Property.

95.     Based on the above, Plaintiff requests that this Court enter judgment against the Fraudulent Rent Collectors as follows: actual damages amounting to $24,000, treble damages amounting to $72,000, and attorney's fees in excess of $10,000.

### C.  COUNT III - Fraudulent Financier Defendants

96.     This Count is against Defendant Daulat R. Aggarwaal, DSA Partners II, Ltd., and DSA Enterprises, L.L.C. ("Fraudulent Financier Defendants").

97.     The association-in-fact enterprise, herein named the Coronado Cabal is an enterprise engaged in and whose activities affect interstate commerce.

98.     The Fraudulent Financier Defendants agreed to, and did conduct, and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically, the Fraudulent Financier Defendants defrauded Soto of funds by fraudulently extending credit to him.

99.     In furthering their scheme, Fraudulent Financier Defendants committed multiple related acts of financing extortionate extensions of credit as described in 18 USCS § 893.

100.    The above-described acts by the Fraudulent Financier Defendants comprise a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

101.    The Fraudulent Financier Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

102.    As a direct and proximate result of the Fraudulent Financier Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his property in that he lost: $20,000 on the down payment stolen by Coronado for the enterprise; $4,000 in uncompensated repairs to the Property; and $5,000 in a fraudulent commission to at the requirement of the Fraudulent Financier Defendants.

103.    Based on the above, Plaintiff requests that this Court enter judgment against the Fraudulent Financier Defendants as follows: actual damages amounting to $29,000; treble damages amounting to $87,000; and attorney's fees in excess of $10,000.

**D.  COUNT IV - Fraudulent Property Managers**

104.    This Count is against Defendant Rahim Mawani, A & R Texas Properties LLC, DSA Partners II, Ltd., and DSA Enterprises, L.L.C. (corporately, "Fraudulent Property Managers").

105.    The association-in-fact enterprise, herein named the Coronado Cabal is an enterprise engaged in and whose activities affect interstate commerce.

106.    The Fraudulent Property Managers agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically, the Fraudulent Property Managers enabled Coronado and the Rent Collectors to show properties used to defraud Plaintiff.

107.    To further their fraudulent scheme, Count IV Defendants committed multiple related acts of financing extortionate extensions of credit as described in 18 USCS § 893.

108.    The above-described acts by the Fraudulent Property Managers comprise a pattern of racketeering activity as defined by 18 U.S.C. § 1961(5).

109.    The Fraudulent Property Managers have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

110.    As a direct and proximate result of the Fraudulent Property Managers' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his property in that he lost $20,000 on the down payment stolen by Coronado for the enterprise and $4,000 in uncompensated repairs to the Property.

111.    Based on the above, Plaintiff requests that this Court enter judgment against Fraudulent Property Managers as follows: actual damages amounting to $24,000, treble damages amounting to $72,000, and attorney's fees in excess of $10,000.

## XIII.   ECONOMIC AND ACTUAL DAMAGES

112.   Plaintiff Soto sustained the following economic and actual damages because of the actions and omissions of Defendants described herein:

      a.   $25,000 in fraudulently obtained payments;

      b.   $4,000 in repairs to the home;

      c.   $5,000 in a "finder's fee" paid to Coronado.

113.   The total economic and actual damages suffered by Soto amount to $29,000.

## XIV.   DAMAGES FOR MENTAL ANGUISH

114.   Soto would further show that the false, misleading, and deceptive acts, practices and omissions described hereinabove were committed "knowingly," as provided by Tex. Bus. & Com. Code § 17.45(9), in that Defendants had actual awareness of the falsity, deception, or unfairness of such acts, practices and omissions.

115.   As a result of such acts, practices and omissions, Soto sustained a high degree of mental pain and distress of such nature, duration, and severity that would permit the recovery of damages for mental anguish pursuant to Tex. Bus. & Com. Code § 17.50(b), for which Soto hereby sues in an amount in excess of the minimum jurisdictional limits of this Court.

## XV.   MULTIPLE DAMAGES

116.   As alleged hereinabove, Soto would show that the false, misleading, and deceptive acts, practices, and omissions complained of herein were committed "knowingly" in that Defendants had actual awareness of the falsity, deception, and unfairness of such acts, practices and omissions.

117.   Soto further avers that such acts, practices and omissions were committed "intentionally" in that Defendants specifically intended that Soto act in detrimental reliance on the falsity or deception or in detrimental ignorance of the unfairness.

118.    Therefore, Soto is entitled to recover multiple damages for his DTPA claim as provided

by Tex. Bus. & Com. Code § 17.50(b)(1) which allows each consumer who prevails may obtain:

> "the amount of economic damages found by the trier of fact.  If the trier of fact
> finds that the conduct of the Defendant was committed knowingly, the consumer
> may also recover damages for mental anguish, as found by the trier of fact, and
> the trier of fact may award not more than three times the amount of economic
> damages;  or if the trier of fact finds the conduct was committed intentionally, the
> consumer may recover damages for mental anguish, as found by the trier of fact,
> and the trier of fact may award not more than three times the amount of damages
> for mental anguish and economic damages;"

119.    Thus, Plaintiff is entitled to treble damages for both his economic loss and the mental

anguish he suffered amounting to no less than $87,000.

## XVI.   ATTORNEY'S FEES

120.    Soto seeks recovery of his reasonable and necessary attorney's fees pursuant to:

a.   Tex. Civ. Prac. & Rem. Code Chapters 37 & 38 *et seq*;

b.   Tex. Bus. & Com. Code § 17.50(d); and

c.   the Common Law.

## XVII.  CONDITIONS PRECEDENT

121.    All conditions precedent have occurred.

## XVIII. PRAYER

Plaintiff Andy Soto respectfully prays that the Defendants be cited to appear and answer, and that Soto have judgment as he is entitled, including costs, specifically:

a. Damages in accordance with allegations in this petition, amounting to no less than $29,000 from each of Count I Defendant (Coronado), Count III Defendants (Fraudulent Financiers), Count IV Defendants (Fraudulent Property Managers), and $24,000 from the Count II Defendants (Fraudulent Rent Collectors);

b. Treble damages in accordance with 18 U.S.C. § 1962 amounting to $87,000 from Count I Defendant (Coronado), $72,000 from Count II Defendants (Fraudulent Rent Collectors), $87,000 from Count III Defendants (Fraudulent Financiers), and $87,000 from Count IV Defendants (Fraudulent Property Managers);

c. Treble Damages in accordance with Tex. Bus. and Com. Code § 17.50(b)(1) and $87,000 against all Defendants as this Court finds is just;

d. Treble damages plus initial fee from Defendant Pauline Coronado Newton in accordance with Tex. Occ. Code § 1101.754(a) totaling $20,000.

e. Restitution of money or Property acquired in violation of DTPA;

f. Attorney's fees;

g. Pre-judgment and post-judgment interest; and

h. Such further relief to which Plaintiff may be entitled.

Respectfully Submitted,

/s/ Warren V. Norred
Warren V. Norred, Texas Bar Number 24045094,
warren@norredlaw.com
515 E. Border; Arlington, Texas 76010
P. 817-704-3984 F. 817-524-6686
Attorney for Plaintiff Andy Soto

<u>ATTACHMENTS:</u>

Exhibit 1 – Declaration of Andy Soto
Exhibit 2 – Texas Comptroller General Reports
Exhibit 3 – Zelle Payments to Coronado
Exhibit 4 – Texts between Pauline Coronado and Andy Soto
Exhibit 5 – Texts between Biju Abraham and Andy Soto
Exhibit 6 – Texts between Neil Aggarwaal and Andy Soto
Exhibit 7 – Call between Biju Abraham and Andy Soto Concerning Rental Agreement
Exhibit 8 – Call between Maria and Andy Soto
Exhibit 9 – Call between Warren Norred and Maria
Exhibit 10 – Call between Warren Norred and Rahim Mawani
Exhibit 11 – A & R Texas Properties LLC Business Documentation
Exhibit 12 – WFAA Article Relating Repeated Instances of Fraud

# APPENDIX

# Table of Contents

| | |
|---|---:|
| Appendix | 1 |
| EXHIBIT 1 - Declaration of Andy Soto | 3 |
| EXHIBIT 2 - Texas Comptroller General Reports | 8 |
| EXHIBIT 3 - Zelle Payments to Coronado | 15 |
| EXHIBIT 4 - Texts between Pauline Coronado and Andy Soto | 20 |
| EXHIBIT 5 - Texts between Biju Abraham and Andy Soto | 28 |
| EXHIBIT 6 - Texts between Neil Aggarwaal and Andy Soto | 33 |
| EXHIBIT 7 - Call between Biju Abraham and Andy Soto Concerning Rental Agreement | 35 |
| EXHIBIT 8 - Call between Maria and Andy Soto | 35 |
| EXHIBIT 9 - Call between Warren Norred and Maria | 36 |
| EXHIBIT 10 - Call between Warren Norred and Rahim Mawani | 38 |
| EXHIBIT 11 - A & R Properties LLC Business Documentation | 38 |
| EXHIBIT 12 - WFAA Article Relating Repeated Instances of Fraud | 44 |

# EXHIBIT 1

Declaration of Andy Soto

EXHIBIT 1

.

## Declaration (Tex. Civ. Prac. & Rem. Code § 132.001)

"My name is Andy Soto, my date of birth is May 4, 1989 and my contact address is 1610 Acosta Street, Grand prairie, TX 75051. I declare under penalty of perjury that the following statements are true and correct."

1. On November 12, 2020, I was interested in finding a home to purchase and contacted Pauline Coronado-Newton ("Coronado") on the recommendation of a friend, who was Coronado's nephew.

2. Coronado and I talked on the phone, where I told Coronado that I was currently renting a home in Fort Worth. Coronado told me that I would always be "in the hole" financially while renting, and that purchasing a home would be a wiser decision. Coronado explained that if someone runs into financial trouble, when he owns a home, he can always sell the home to get his money back.

3. Coronado told me that she knew of a house that she could place my family and I in. This house is located at 1610 Acosta St, Grand Prairie, Texas 75051 ("Property").

4. Coronado was previously given permission to show the Property by Biju Abraham, David, and Rahim Mawani of A & R Texas Properties LLC, which owns the Property.

5. Upon hearing that I had $20,000 in savings, Coronado told me that she and her associates could execute a rent-to-own agreement for the property where Soto would put $20,000 down and pay $1,400 monthly.

6. Relying on Coronado's representation that I would eventually own the Property, I made a first payment to Coronado for $500 on November 19, 2020. This payment was memorialized in a receipt written by Pauline. I then continued to pay Pauline with bills and through Zelle for a total amount of $40,000.

7. The Property needed substantial repair work, so Pauline agreed to credit the cost of repairs that Soto performed to the total price of the Property. I spent at least $4,000 in repairs and improvements to the Property, which included replacing cabinets, remodeling the kitchen, and deep-cleaning the Property, as it was roach and rat-infested at the time.

8. On February 28, 2021, two individuals appeared on the Property and introduced themselves to Soto as "Abraham" and "David". I later learned Abraham was Biju Abraham, while David's last name is still unknown to me. Upon information and belief, Abraham and David are both owners of A & R Texas Properties, LLC—though they did not share this information with me at the time.

9. Abraham and David represented to me that they were the owners of the home and that Coronado had not given them any of the money I paid her. Abraham and David told me that I had no ownership interest in the Property and Coronado had no authority to execute a rent-to-own agreement with me.

**EXHIBIT 1**

10. When I asked them how I could get the money back from Coronado, they told me the money was gone, and I would need to pay them rent if I wished to stay on the Property.

11. I objected, explaining to them that I already paid Coronado over $20,000, which was supposed to constitute rent payments and a down payment on the Property, but they again claimed that they never received any of that money.

12. Abraham and David had a history of working with Pauline and allowed her to show and fill other properties owned by their company Texas A & R Properties LLC, including a property at 2901 Caladium Court, Garland, TX 75040, which Abraham showed to me as an alternative to the Property. Abraham and David explained that Coronado had a history of defrauding people. In fact, I later saw news articles corroborating their assessment of Coronado's behavior. Despite their knowledge of Coronado's deceptive practices, they continued to work with Coronado, allowing her to use their properties as a vehicle to perpetuate fraud.

13. Coronado paid David and Abraham to allow her to show the Property through Zelle from an account labeled COAB Contractors LLC, which upon information and belief, is a company co-owned by Abraham and Coronado.

14. I told Abraham and David that I would be willing to start paying rent when certain repairs were made on the Property, including plumbing repairs, window repairs and updates, repairing showers, and general maintenace. David and Abraham agreed to the proposal, but never completed the repairs as promised. As per their agreement, I withheld rent since they had not completed the repairs.

15. After discovering that her fraud, I confronted Coronado about refunding the money I gave her. Coronado claimed that the money was gone, and she could not afford to repay me. Instead, Coronado offered to place me in another home. Unsurprisingly, this property was also owned by Abraham and David through Texas A & R Properties LLC. Soto refused.

16. Coronado then suggested that she and I could go into business together and claimed that I could make the money back that way. Coronado explained that the two of us would invest in houses together and flip them for profit. Coronado stated that her associate Neil Aggarwaal of DSA Partners II, Ltd. would finance the transactions.

17. On Coronado's instruction, I contacted Aggarwaal to set up financing, but Aggarwaal refused to work with me until I paid Coronado a $5,000 "finder's fee" for bringing me the transaction. Aggarwaal insisted that the payment be made up-front, before he and I did any business together. Believing this was the only way to get the rest of my money back, I paid Coronado the additional $5,000. Financing with Aggarwaal subsequently fell through, Coronado refused to refund the $5,000 that Aggarwaal had required me to pay her.

**EXHIBIT 1**

18. On March 23, 2021, David and Abraham returned to my Property to discuss a formal rental agreement and the repairs that still needed to be completed before I would begin paying them rent. David and Abraham stated that they would present me with a formal lease agreement for me to sign.

19. Though such a formal agreement was never presented to me, Abraham and David continued to press me to pay them rent through text messages. Even though repairs had still not been completed. I responded by asking for the written agreement.

20. I spoke to Abraham in a phone call and explained that I retained the counsel, who could review the lease agreement, and requested that Abraham send it over. Abraham agreed to do so, but shortly thereafter ceased all communication with me.

21. I then discovered that the Property's water had been shut off, and its electricity followed soon after. After making several attempted phone calls to Abraham, who refused to pick up, I restored service under my own name.

22. I then received a call back by a woman who introduced herself as "Maria." She represented herself as an attorney and claimed to handle the legal problems of the Property owner. Maria attempted to intimidate me, telling me that I was squatting on the Property and would be sent a notice to vacate.

23. I objected, explaining that Abraham and David were going to provide me with a formal lease agreement. Maria responded by asserting that Abraham had no right to the property, and therefore could not have conveyed the Property to me. She also stated that Coronado had no right to the Property and had caused problems for people like me in this manner before.

24. Maria refused to give me the name of her employer, though later admitted she admitted to my counsel that she works as an agent of Texas A & R Properties LLC, managing their affairs and handling evictions. During my conversation with her, she refused to answer the question of whether she was an attorney. Maria ended the phone call by claiming she could not speak with me if I was represented by an attorney, which further emphasizes her attempt to imitate an attorney herself. She told me once again that I was squatting and would be sent a notice to vacate.

25. In preparation to take legal action, my counsel sent a demand letter on my behalf to Texas A & R Properties LLC's registered agent Rahim Mawani ("Mawani"). Mawani called my counsel's office in response to the letter and explained that he was an owner of Texas A & R Properties LLC. Mawani claimed that before he received the letter, he no idea that I occupied the Property . Upon being questioned about the call I received from Maria, who claimed to work for Mawani, Mawani alleged that he did not have anyone named Maria working for him.

**EXHIBIT 1**

26. Mawini claimed that he had a purchase-sale contract for the Property signed by Abraham.

Executed in Tarrant County, Texas on May 20, 2021.

Andy Soto

# EXHIBIT 2

Texas Comptroller General Reports

**EXHIBIT 2**





# Franchise Tax Account Status

As of : 06/01/2021 16:55:59

This page is valid for most business transactions but is not sufficient for filings with the Secretary of State

| C & A ASSOCIATES INC | |
|---|---|
| **Texas Taxpayer Number** | 30006119975 |
| **Mailing Address** | 11603 ALIEF CLODINE RD %CHRIS DENBOW HOUSTON, TX 77082-2601 |
| ❓ **Right to Transact Business in Texas** | FRANCHISE TAX INVOLUNTARILY ENDED <br> Request tax clearance to reinstate entity |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 11/13/1981 |
| **Texas SOS File Number** | 0058540800 |
| **Registered Agent Name** | CHRISTINE J DENBOW |
| **Registered Office Street Address** | 11603 ALIEF CLODINE RD HOUSTON, TX 77082 |

**EXHIBIT 2**





# Franchise Tax Account Status

As of : 06/01/2021 16:55:59

---

This page is valid for most business transactions but is not sufficient for filings with the Secretary of State

---

| C & A ASSOCIATES INC | |
|---|---|
| **Texas Taxpayer Number** | 32059874894 |
| **Mailing Address** | 2121 W AIRPORT FWY STE 101 IRVING, TX 75062-6010 |
| **❓ Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 03/15/2016 |
| **Texas SOS File Number** | 0802413382 |
| **Registered Agent Name** | DIONNE CHESHIER |
| **Registered Office Street Address** | 2121 W AIRPORT FREEWAY STE 101 IRVING, TX 75062 |





# Franchise Tax Account Status

As of : 04/20/2021 16:19:03

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

| COAB CONTRACTORS LLC | |
|---|---|
| **Texas Taxpayer Number** | 32065583877 |
| **Mailing Address** | 2121 W AIRPORT FWY STE 102 IRVING, TX 75062-6010 |
| **❓ Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 12/04/2017 |
| **Texas SOS File Number** | 0802873578 |
| **Registered Agent Name** | C & A ASSOCIATES INC |
| **Registered Office Street Address** | 2121 W AIRPORT FREEWAY STE 101 IRVING, TX 75062 |

**EXHIBIT 2**





# Franchise Tax Account Status

As of : 06/03/2021 10:26:20

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

| DSA ENTERPRISES, L.L.C. | |
|---|---|
| **Texas Taxpayer Number** | 32011657593 |
| **Mailing Address** | PO BOX 866031 PLANO, TX 75086-6031 |
| ❓ **Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 06/24/2003 |
| **Texas SOS File Number** | 0800217505 |
| **Registered Agent Name** | DAULAT R AGGARWAL |
| **Registered Office Street Address** | 2205 MISTY HAVEN LN. PLANO, TX 75093 |

EXHIBIT 2





# Franchise Tax Account Status

As of : 06/01/2021 16:57:12

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

| DSA PARTNERS II, LTD. | |
|---|---|
| **Texas Taxpayer Number** | 32035371783 |
| **Mailing Address** | 2205 MISTY HAVEN LN PLANO, TX 75093-2558 |
| **❓ Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 07/08/2005 |
| **Texas SOS File Number** | 0800516086 |
| **Registered Agent Name** | DAULAT R. AGGARWAAL |
| **Registered Office Street Address** | 2205 MISTY HAVEN PLANO, TX 75093 |

**EXHIBIT 2**





## Franchise Tax Account Status

As of : 06/01/2021 15:38:02

---

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

---

| | |
|---|---|
| **TEXAS A & R ENTERPRISES, LLC** | |
| **Texas Taxpayer Number** | 32051753476 |
| **Mailing Address** | 705 CANCUN APT 1 PHARR, TX 78577-2420 |
| ❓ **Right to Transact Business in Texas** | FORFEITED<br>File missing reports, information reports and/or payments |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 08/15/2013 |
| **Texas SOS File Number** | 0801834097 |
| **Registered Agent Name** | DAVID ROMEO ALANIZ |
| **Registered Office Street Address** | 705 CANCUN, #1 PHARR, TX 78577 |

# EXHIBIT 3

Zelle Payments to Coronado



All transactions     Spending summary

We found more than 32 transactions.

QuickPay with Zelle payment to Pauline Real Estate Thowed g JPM476051147

$15,206.60      -$1,500.00

Nov 20, 2020

Nov 19, 2020

QuickPay with Zelle payment to Pauline Real Estate Thowed g JPM474481145

$17,270.66      -$550.00

Andy Soto Zelle Payments to Pauline Coronado



Andy Soto Zelle Payments to Pauline Coronado



Andy Soto Zelle Payments to Pauline Coronado



Andy Soto Zelle Payments to Pauline Coronado



Andy Soto Zelle Payments to Pauline Coronado

# EXHIBIT 4

Texts between Pauline Coronado and Andy Soto



Text Conversations between Pauline Coronado and Andy Soto



Text Conversations between Pauline Coronado and Andy Soto



Text Conversations between Pauline Coronado and Andy Soto

**EXHIBIT 4**



Text Conversations between Pauline Coronado and Andy Soto



Text Conversations between Pauline Coronado and Andy Soto



Text Conversations between Pauline Coronado and Andy Soto

# EXHIBIT 5

Texts between Biju Abraham and Andy Soto









# EXHIBIT 6

Texts between Neil Aggarwaal and Andy Soto



# EXHIBIT 7

Call between Biju Abraham and Andy Soto Concerning Rental Agreement

AVAILABLE TO ALL PARTIES UPON REQUEST

# EXHIBIT 8

Call between Maria and Andy Soto

AVAILABLE TO ALL PARTIES UPON REQUEST

# EXHIBIT 9

Call between Warren Norred and Maria

AVAILABLE TO ALL PARTIES UPON REQUEST

# EXHIBIT 10

Call between Warren Norred and Rahim Mawani

AVAILABLE TO ALL PARTIES UPON REQUEST

# EXHIBIT 11

A & R Texas Properties LLC Business Documentation

**EXHIBIT 11**





## Franchise Tax Account Status

As of : 06/03/2021 09:53:40

---

**This page is valid for most business transactions but is not sufficient for filings with the Secretary of State**

---

| A & R TEXAS PROPERTIES LLC | |
|---:|:---|
| **Texas Taxpayer Number** | 32059191513 |
| **Mailing Address** | 4001 N JOSEY LN STE 200 CARROLLTON, TX 75007-1534 |
| **❓ Right to Transact Business in Texas** | ACTIVE |
| **State of Formation** | TX |
| **Effective SOS Registration Date** | 01/04/2016 |
| **Texas SOS File Number** | 0802360427 |
| **Registered Agent Name** | RAHIM MAWANI |
| **Registered Office Street Address** | 4001 N JOSEY LANE SUITE 100 CARROLLTON, TX 75007 |

**EXHIBIT 11**



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

### Certificate of Formation
### Limited Liability Company

**Filed in the Office of the
Secretary of State of Texas
Filing #: 802360427 01/04/2016
Document #: 647937650002
Image Generated Electronically
for Web Filing**

| Article 1 - Entity Name and Type |
| --- |

The filing entity being formed is a limited liability company. The name of the entity is:

**A & R Texas Properties LLC**

| Article 2 – Registered Agent and Registered Office |
| --- |

☐ A. The initial registered agent is an organization (cannot be company named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**
**Rahim    Mawani**

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**4001 N Josey Lane Suite 100    Carrollton  TX  75007**

| Consent of Registered Agent |
| --- |

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

| Article 3 - Governing Authority |
| --- |

☐ A. The limited liability company is to be managed by managers.

**OR**

☑ B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

| Managing Member 1: **Rahim    Mawani** | Title: **Managing Member** |
| --- | --- |
| Address: **4001 N Josey Lane Suite 100    Carrollton  TX, USA  75007** | |

| Article 4 - Purpose |
| --- |

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Kumod Rimal**          <u>300 Republic Lane, Euless, TX 76040</u>

**Effectiveness of Filing**

☑A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Kumod Rimal**

Signature of Organizer

FILING OFFICE COPY

**Filing Number: 802360427**

**EXHIBIT 11**

1733969760091 17319

TX2017
Ver. 8.0

05-102
(Rev.9-15/33)

# Texas Franchise Tax Public Information Report

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ **Tcode  13196**

■ Taxpayer number

■ Report year
**2017**

You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.

Taxpayer name
**A & R Texas Properties LLC**

Mailing address
**4001 N Josey Lane STE 100**

■ ☐ Check box if the mailing address has changed.

City
**Carrollton**

State
**TX**

ZIP code plus 4
**75007**

Secretary of State (SOS) file number or Comptroller file number

☐ Check box if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office
**4001 N Josey Lane STE 100 Carrollton TX 75007**

Principal place of business
**4001 N Josey Lane STE 100 Carrollton TX 75007**

You must report officer, director, member, general partner and manager information as of the date you complete this report.

**Please sign below!    This report must be signed to satisfy franchise tax requirements.**

3205919151317

## SECTION A    Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | | | |
|---|---|---|---|---|---|
| Rahim Mawani | | ☒ YES | Term expiration | m m  d d  y y | |
| Mailing address 4001 N Josey Lane | City Carrollton | | State TX | | ZIP Code 75007 |
| Name | Title | ☐ YES | Term expiration | m m  d d  y y | |
| Mailing address | City | | State | | ZIP Code |
| Name | Title | ☐ YES | Term expiration | m m  d d  y y | |
| Mailing address | City | | State | | ZIP Code |

## SECTION B    Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more.

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |

## SECTION C    Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|

Registered agent and registered office currently on file (see instructions if you need to make changes)

You must make a filing with the Secretary of State to change registered agent, registered officer or general partner information.

Agent:

Office:

City

State

ZIP Code

The information on this form is required by Section 171.203 of the Tax Code for each corporation LLC, LP, or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

**sign here** ▶ 

Title
**President**

Date
**04/01/2017**

Area code and phone number
**(972)333-1659**

☐ VE/DE ☐    PIR IND ☐



**1024**

# EXHIBIT 12

WFAA Article Relating Repeated Instances of Fraud

**INVESTIGATES**

# Stuck in the Middle: Investigation reveals alleged home scam targeting Latinos

More than 50 families who claim to have lost more than $400,000 in down payments have contacted the Dallas County District Attorney's office.

Author: **Tanya Eiserer, Mark Smith**
Updated: **10:16 PM CDT October 19, 2018**



Francisco Grimaldo thought he'd found his dream home.

"Everybody got a dream to have a house," the father of four told WFAA.



00:08 / 02:29

Francisco Grimaldo

Grimaldo made $13,500 in down payments. He spent thousands more remodeling it.

Ramona Gomez also thought she'd found her dream home.

"I loved this house," Gomez said. "I fell in love with it the minute I saw it."



Ramona Gomez

She said her father gave her his life savings to put down a down payment of $15,500 in 2015. Gomez also claimed to make tens of thousands in improvements.

"I wouldn't give them $15,000 if I knew the house wasn't going to be mine," Gomez said.

Grimaldo and Gomez are among the dozens of North Texas Latino families who claim they were misled into believing they were on track to one day own their homes.

Many signed what's called option-to-purchase agreements, and they made down payments to lock in the purchase price.

In other cases, families signed leases that they say they thought were purchase agreements.

After WFAA began asking questions, the landlord for Grimaldo, Gomez and four other families agreed to enter into owner-finance arrangements with them, meaning they will finally be home buyers.

Dozens of other families still face uncertainty.

Attorneys have alleged the families were defrauded. Many of the families have limited English skills, and lack a knowledge of real estate law.



EXHIBIT 12

Sharon Easley

"They're enticing these people to come into these homes, like them, sell them a real deal," said Sharon Easley, an attorney who represents Gomez, Grimaldo and four other families. "They scrounge up every penny they can scrounge up, pay it to them, thinking they are buying a house only to discover that they have not bought a house."

Various families told WFAA they were misled into believing that they would receive owner financing.

"I even have one where they put a new roof on the house," Easley said. "You don't do that when you think you're just renting,"

"The whole thing was designed to give these individuals false hopes to own a home," said Allen Vaught, an attorney who represents nearly 25 families. "They would put down $9,000 to $20,000, and the goal post in attempting to purchase these homes kept moving,"

"It was all an illusion where these folks were chasing a false promise or dream," Vaught said.

More than 50 families who claim to have lost more than $400,000 in down payments have contacted the Dallas County District Attorney's office. Prosecutors have launched a criminal investigation.

Families blame the property owners. And some, at least initially, blamed a woman named Pauline Coronado.


Pauline Coronado

The families said Coronado brokered the deals.

Coronado has denied any wrongdoing. She said she merely acted as a go-between for the property owners and the families.

"It was really a good idea in the beginning," Coronado told WFAA. "I can tell you now that anybody had the right to purchase their home if they had financing."

"The idea was to give people who may not have been able to get financing through traditional means a path to home ownership.

"They had good jobs. They made good money, so we thought: 'OK, this is a good way for them to buy a home,'" she said.

Gomez and Grimaldo both say they believed the property owner, Mohamed Khaleel, would, from the beginning, owner-finance their homes.

"I started asking him: 'When are we going to the title company?'" Gomez said.

For their part, Khaleel and another property owner point the finger at broker Pauline Coronado. They claim she had families sign purchase contracts without their knowledge.

Khaleel denied any wrongdoing in a complaint to the Dallas County District Attorney against Coronado.

"Unbeknownst to Mr. Khaleel, Ms. Coronado was coercing tenants to enter into option to purchase agreements," his complaint states. "None of these options were signed by Mr. Khaleel. Ms. Coronado kept all of the money she received for the options."

Khaleel's attorney, Michael Nixon, told WFAA in an email that Khaleel was "as much a victim of Ms. Coronado's wrongdoing as the tenants from whom she took the option payments."

Coronado, however, said Khaleel wasn't telling the truth. She provided WFAA a copy of a cashier's check for $5,500 made out to Khaleel for what she said was part of the down payment made by Grimaldo.

WFAA caught up with Khaleel at a recent eviction hearing. He declined to comment on the advice of the attorney who was with him.

On Wednesday, Khaleel took a different tack.

Not only did he agreed to owner-finance the purchase of the homes for Grimaldo and Gomez, and four other families, but also gave them credit towards the purchase price of the home for any prior down payments, and any upgrades and repairs to the homes.

Under the terms of the new agreement, a certified appraiser selected by the families will assess the market value of the home.

In all, the six families made about $80,000 in down payments, and up to $150,000 in improvements, according to their attorney.

In another part of Dallas County, the Martinez family thought they were leasing to own a home. They paid a $27,000 down payment to buy the house for $70,000.



Mary Ellen Smith

The lease they signed in December 2014 stated that the home was in a livable condition.

The lease agreements, however, contradict the reality, said Mary Ellen Smith, an attorney representing the family. The home was in such disrepair that it was uninhabitable, she said.

Smith said the family spent another $61,000 on remodeling so they could one day live in it. The family has never spent one night in the home, Smith said.



Karina Chavarria Martinez

"We actually thought we were going to buy this house. That's why we were fixing it," said Karina Martinez, whose mother signed the option and lease agreements. "We came to the understanding that we were never buying this house. We were just renting the house."

Smith said the family was sold a "false American dream."

"They were simply taking her money, getting their house fixed, to them go sell to someone else," she said.

Nick Hockman, who says he is the owner of the Martinez's house, declined an on-camera interview. He told WFAA that – much like Khaleel's initial claims – he was misled by Coronado. He claims she pocketed the down payment after forging his name on the purchase agreement.

"It appears that she's misled people, or they misunderstood, and I think there's a combination," Hockman told WFAA.

He distanced himself from Coronado, calling her an independent agent. He said he never paid her any money. He said he sent out letters a year ago instructing his tenants not to give any money to Coronado.

00:08 / 02:29

EXHIBIT 12

Hockman did acknowledge to WFAA about having discussions with the Martinez family about buying the home.

"They told me multiple times that they would pay that thing off in three months," Hockman said. "I kept going to them and saying, 'Hey you're supposed to be paying this off. What are you doing?'"

He said they told him they wanted to do repairs before getting a loan on the home.

"I would love to work it out with them," Hockman said. "I would love to make a win-win out of a terrible situation."

Hockman said he could not have owner financed at least some of the homes because he himself has loans on the properties, he said.

"It makes me sick to my stomach that my name's being tarnished because of this nonsense," he said. "I would never scam anybody."

Hockman told WFAA that he has had several option-to-purchase agreements that did result in families being able to buy the home.

Coronado disputed Hockman's claims. She said she used to collect rent and down payments for him, and then regularly met at his office to give him the money. She said money from down payments for homes was to be given to him in cash.

"I made Mr. Hockman a lot of money; I worked for him for a few years," Coronado said. "He knows I did so he can say whatever he wants."

She also showed WFAA text messages from Hockman discussing possible purchase prices of homes, and copies of rent checks she dropped off at his home.

**BREAKING NEWS**   Rick Carlisle says he's not returning as Mavericks head coach **Read More »**

than $40,000 to various families. She vows, if needed, to testify in court against Hockman to help the Martinez family.

"I think they deserve that house," Coronado said. "I really do."

State law strictly regulates residential lease-option agreements that are longer than 180 days. The law puts the burden on the seller to ensure that strict requirements are followed. Violations can result in having to return all payments made by the buyer, including monthly payments.

It can also result in liability under the Detective Trade Practices Act, which mean in damages being tripled, plus attorney's fees.

"My general thought is that they're usually a bad deal," said Corinna Chandler, a Dallas attorney not involved in any of the cases. "But if you're going to sign one, talk to a lawyer."

Chandler reviewed several of the contracts for WFAA and saw big flaws.

She said some of the agreements appear to be illegal on their face because they state that the down payments could be lost being late on the rent.

"If you look at just the language of the contracts, it's clear that there was no attorney involved in drafting them," Chandler said.

Email: investigates@wfaa.com

00:08  /  02:29